UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JESSE L. HERRMANN,

        Petitioner,

    v.                                     Case No. 16-cv-1353-pp

MICHAEL MEISNER,

        Respondent.

**ORDER ADOPTING JUDGE DUFFIN'S RECOMMENDATION (DKT. NO. 15); GRANTING MOTION FOR EXTENSION OF TIME TO FILE OBJECTIONS (DKT. NO. 16); OVERRULING OBJECTIONS (DKT. NO. 17); DENYING *HABEAS* PETITION; DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY AND DISMISSING CASE**

On October 11, 2016, the petitioner, through counsel, filed a petition for a writ of *habeas corpus* under 28 U.S.C. §2254, challenging his November 28, 2011 judgment of conviction in La Crosse County Circuit Court. Dkt. No. 1 at 2. On August 9, 2019, after referral from this court, Magistrate Judge William E. Duffin issued a report recommending that the court deny the petition. Dkt. No. 15. The petitioner has filed a motion for extension of time to object, dkt. no. 16, and has filed objections, dkt. no. 17. Because this court agrees with Judge Duffin's finding that the Wisconsin Supreme Court did not unreasonably apply federal law, it will dismiss the petition.

## I.    Background

### A.    State Court Conviction and Sentencing

In October 2011, the petitioner pled guilty to homicide by intoxicated use of a vehicle, two counts of injury by intoxicated use of a vehicle, two counts of

operating while intoxicated causing injury and one count of hit and run involving death. Dkt. No. 1 at 2. The facts were undisputed; the petitioner drove his pick-up truck into the rear end of a car waiting to make a left turn. State v. Herrmann, 364 Wis. 2d 336, 341 (2015). The pick-up struck the car with such force that the grill of the truck ended up in the back seat of the car. Id. Of the five passengers in the car, one died on the scene; the other four sustained serious injuries. Id. The petitioner ran from the accident site, but bystanders kept him from leaving the scene. Id. Later blood testing showed the petitioner had a blood alcohol concentration of 0.215. Id.

On November 28, 2011, the trial judge sentenced the petitioner to thirty-one years' imprisonment and forty years of extended supervision. Dkt. No. 8-3 at 137-39. The sentencing hearing began with the trial judge making a record of her personal circumstances:

> THE COURT: Mr. Herrmann, there is a matter that I'd like to put on the record again just before we begin. It's not a secret that I lost a sister to a drunk driver in the summer of 1976. I made this known. I don't believe that this will have any impact on my ability to set that aside and sentence you based upon the information presented on your case and not my sister's case, but I want you to understand right off the get-go that that is something that I have very zealously tried to set aside, and I do believe that I am able to do that. If you have any issues or questions that you want to ask relative to that, you're certainly welcome to ask them now.
>
> THE DEFENDANT: I have none.
>
> THE COURT: No problems?
>
> [Defense Counsel]: No problems.

Dkt. No. 8-3 at 54. The sentencing hearing proceeded with a number of emotional testimonials from the four surviving victims, friends, families, a

2

pastor and a bystander. Id. at 55-92. The trial judge also heard from the defendant's family. Id. at 93-105. The state advocated for its recommendation that the court impose a "lengthy prison sentence." Id. at 105. Defense counsel advocated for the term recommended in the alternative PSI (Presentence Investigation Report)—fifteen years imprisonment. Id. at 117, 132. The defendant testified and expressed his remorse. Id. at 118-120.

In announcing her sentence, the trial judge expressed concern about alcohol use in the community:

> It is so easy to be in this community, and like Pastor indicated, I, too, have been shocked by the seeming blasé faire [sic] attitude that this community has about alcohol use, because it is easy when these tragedies occur to paint the person who's behind the wheel while intoxicated to be a monster, and so we have a lot of grief and a lot of energy and a lot of community outrage, and that community outrage is aimed and directed at the person behind the wheel, and I believe that when we do that, we lose an opportunity, we lose an opportunity for raising the consciousness of the community because we are not here just because of Mr. Herrmann, just as the Mullenbachs were not in court grieving because of Mr. Nehring, and I think its important for me to just remind us of what those two things are.

Id. at 125-26. She continued:

> People that get behind the wheel of a car while they have been drinking in my opinion any amount are putting themselves and this community at risk, and yet day after day, month after month our community just says, oh, well. We complain and we talk about how we should challenge the students at the university not to continually drink to excess, how kids disappear, and how much harm alcohol is, but how many of us actively, actively seek to change the behaviors of those in our lives? How many of us go out for that Friday fish fry and then not make any arrangements for who's gonna drive the car home?

Id. at 126. She transitioned to a discussion of the petitioner's past before returning to her belief that the community "must do more" to discourage drunk

3

driving accidents and deaths. Id. at 127-28. In that context, the judge

described her past personal experience:

> In 1976 five young women got into a vehicle, and only one of them
> survived. The two gentlemen in the other vehicle were 17, drunk out
> of their minds, and they did not survive. That was my personal story,
> and I will tell you that a day does not go by that I do not think of
> that personal tragedy, and I wish that I could tell these victims that
> that pain will one day disappear, but it doesn't. Time makes it less.
> We redirect ourselves to other things, and a day does go by when we
> don't think of our loved ones and then we feel guilty at night because
> that happened, but life does go on, and I am very grateful today that
> I'm looking at four lovely young ladies and that only one family has
> to go through the pain that my family and the other three young
> ladies' families had to endure in 1976.
>
> And so perhaps it is again destiny or a higher power or, Pastor,
> probably the prayers of many others that bring me to be the judge
> on this particular case because I probably more than anyone else
> who would be able to sit on this bench in this county understand
> the pain that these victims are feeling, but I have had the benefit of
> all those years since 1976 to understand that I have to make Mr.
> Herrmann pay, but that nothing I do to him will lessen that pain,
> and that if I don't do more than just incarcerate Mr. Herrmann, if I
> don't speak out on behalf of the community today, then this tragedy
> will continue to happen on our streets, and more families will suffer
> the way these families suffer today.
>
> So Mr. Herrmann, you're going to prison today, but that's just part
> of the story. I want to make sure that the story is not about what a
> monster Jesse Herrmann was and is so that we can then wrap up
> this little episode in a nice neat little box and all go about our
> business as usual, that Mr. Herrmann the monster is off the streets,
> and we don't have to worry about this again, because no matter what
> I do to Mr. Herrmann, unless this community begins to take a
> different attitude about drinking and driving, and I'm talking about
> different attitude, not paying service, but actually doing, we will see
> this tragedy happen again and again.

Id. at 128-29. After imposing sentence, the court discussed the conditions of

the petitioner's supervision. The conditions included the following:

> THE COURT: You will have no contact with these victims or their
> families, and on that score I feel compelled to make a statement

4

about your letter. I don't know what the motivation would have been for you to write such a letter to these victims, but you are never, ever to communicate, not just with them, but with any member of their families or write any letter to any other member of the community without first having that sent to the district attorney's office for review.

THE DEFENDANT: I had just one question.

THE COURT: Mm-hmm.

THE DEFENDANT: I did that—what I was supposed to do with my letters when I asked if I could write them was to give them to the district attorney who was gonna make copies of them and put them in the envelopes, and if the family of the girls wanted to read them and the family . . . wanted to read them, they could have the option to read them or not.

THE COURT: Well, I'm not sure how that got lost in the translation, Mr. Herrmann, but let me just say from the bench as a condition of your extended supervision other than your own family members any letter that you would write to any member of the community rendering any excuses, opinions, or concerns about your sentence or about this crime need to be run through the district attorney's office. Okay?

<u>Id.</u> at 140.

B.     <u>State Post-Conviction Proceedings</u>

1.     *Post-conviction motion in circuit court*

In late 2012, the petitioner filed a postconviction motion requesting resentencing; he contended that the sentencing judge was biased due to her personal experiences. Dkt. No. 8-7 at 1, 2. The circuit court—the same judge who had sentenced the petitioner—denied the motion, writing:

[The petitioner's] claim is unfounded. The court properly exercised its discretion by ensuring that the sentencing record identified the objectives of the sentence and that the sentencing record demonstrated how the relevant facts and factors furthered those objectives. The arguments raised by [the petitioner] ask this court to depart from the well-established policy that circuit court sentencing

5

decisions should be presumed reasonable and unbiased and asks for resentencing based on one short excerpt from a lengthy sentencing transcript that was completely taken out of context.

Id. at 2-3.

2. *Direct Appeal and Appeal of Post-conviction motion*

In January 2013, the petitioner appealed both his conviction and the order denying postconviction relief. Dkt. No. 1-1 at 1; see also State v. Herrmann, La Crosse County Case No. 11CF000349 (available at https://wcca.wicourts.gov). He again argued that the judge's sentencing statements demonstrated an impermissible bias. Id. at 2-3.

The Wisconsin Court of Appeals rejected the state's argument that the petitioner waived claims of bias by agreeing to proceed after the judge first disclosed her personal circumstances. Id. at 3-4. On the merits, however, the Court of Appeals found no objective bias, remarking that it could not identify any objective facts showing that the judge treated the petitioner differently. Id. at 4. As for whether there was an impermissible appearance of bias, the court asked "whether a reasonable person could question the court's impartiality based on the court's statements." Id. (citing State v. Goodson, 320 Wis.2d 166 (Wis. Ct. App. 2009)). It called the case "close." Id. It ultimately found the sentencing remarks "difficult to distinguish . . . from those we have seen in many other sentencing transcripts in which a judge expresses an understanding of the plight of victims of a crime." Id. The court found that it was "not uncommon for circuit court judges to have themselves been victimized by the types of crimes that are before them, or to express understanding of

6

what it might be like to be a victim of those crimes." Id. These types of statements, the court noted, "evince[d] an understanding of a crime's severity and its effect on victims." Id. at 5. "Viewing the sentencing as a whole," the appellate court determined that "a reasonable person would not conclude that the judge was biased." Id.

> 3.  *Wisconsin Supreme Court Opinion (Dkt. No. 8-2)*

The petitioner sought review in the Wisconsin Supreme Court, which on July 15, 2015 issued a decision affirming the Court of Appeals. Dkt. No. 8-2 at 2. Justice Ann Walsh Bradley wrote the lead opinion for a unanimous court. Id. Justices Prosser and Ziegler wrote concurring opinions. Id. at 1.

After reproducing the sentencing statements, Justice Bradley recognized the importance of a fair tribunal as a tenet of due process, id. at 6-9, 11 (citing Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 885 (2009)), and reviewed Wisconsin's precedent on judicial bias, id. at 10-11. She began by noting the presumption that a judge acts fairly, impartially and without prejudice. Id. (citing State v. Goodson, 320 Wis. 2d 166, 173 (Wis. Ct. App. 2009)). She observed that the presumption can be rebutted, but that the burden of rebuttal falls on the party asserting bias. Id. at 11 (citing State v. Gudgeon, 295 Wis. 2d 189, 203 (Wis. Ct. App. 2006)).

Justice Bradley remarked that this case required analysis of the objective test of judicial bias. Id. at 11-12. She wrote:

> Under the objective approach, courts have traditionally considered whether "there are objective facts demonstrating . . . the trial judge in fact treated [the defendant] unfairly." Goodson, 320 Wis. 2d 166, ¶9 (quoting McBride, 187 Wis. 2d at 416). In other words, they

7

inquire into whether a reasonable person could conclude that the trial judge failed to give the defendant a fair trial.

Id. at 12. She remarked that "[c]ourts have since recognized that the right to an impartial decisionmaker stretches beyond the absence of actual bias to encompass the appearance of bias as well." Id. at 13. She recited the Court of Appeals' formulation of the test: "'the appearance of bias offends constitutional due process principles whenever a reasonable person—taking into consideration human psychological tendencies and weaknesses—concludes that the average judge could not be trusted to hold the balance nice, clear and true under all the circumstances.'" Id. at 14 (citing Gudgeon, 295 Wis.2d at 206).

Justice Bradley then analyzed the United States Supreme Court's discussion of objective bias in Caperton, 556 U.S. 868. Id. at 14. She found that Caperton's formulation of the due process inquiry for objective bias also focused on whether the appearance of bias created "a serious risk of actual bias." Id. at 14-15. She noted that the Caperton court was careful to comment that the case's facts constituted "'an extraordinary situation where the Constitution require[d] recusal.'" Id. at 16 (quoting Caperton, 556 U.S. at 887). Nevertheless, Justice Bradley wrote:

> [I]n determining that there was a serious risk of actual bias, [Caperton] provided a test that can apply to a multitude of scenarios: "Due process requires an objective inquiry into whether the contributor's influence on the election under all the circumstances 'would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear, and true.'"

8

Id. at 16 (quoting Caperton 556 U.S. at 885). She dismissed the concerns of the concurring opinions—which advocated a narrow reading of Caperton—and summarized the test she would apply: "When determining whether a defendant's right to an objectively impartial decisionmaker has been violated we consider the appearance of bias in addition to actual bias. When the appearance of bias reveals a great risk of actual bias, the presumption of impartiality is rebutted, and a due process violation occurs." Id. at 21 (citing Caperton, 556 U.S. at 885; Goodson, 320 Wis. 2d 166 at 173; Gudgeon, 295 Wis. 2d 189, 205).

Finally, Justice Bradley applied the law to the facts of the petitioner's case. Id. at 21. She recounted the thrust of the sentencing testimony from each of the surviving victims, their families, a pastor and someone present at the scene. Id. at 22-24. She summarized the testimony from the defendant's family members. Id. at 24. Against that background, she analyzed the circuit judge's sentencing remarks:

> [I]n this context, it is apparent that although the judge's statements about her sister were personal, they were used in an attempt to illustrate the seriousness of the crime and the need to deter drunk driving in our society. They do not appear as an expression of bias against [the petitioner].

Id. at 26. Justice Bradley wrote that Wisconsin law requires sentencing judges to specify sentencing objectives, which can include "protection of the community, punishment of the defendant, rehabilitation of the defendant, and deterrence to others." Id. at 26. She found that the sentencing judge's statements properly complied with this law and "did not reveal a great risk of

9

actual bias." Id. at 28. Accordingly, the Wisconsin Supreme Court determined that the petitioner had not rebutted the presumption of impartiality and had not shown a due process violation. Id. at 29.

4.     *Concurring Opinions*

Justices David Prosser and Annette Ziegler wrote concurring opinions. Although Justice Prosser agreed with "the bottom line of the lead opinion," id. at 30, he wrote to express his disagreement with the majority's distillation of Wisconsin case law and Caperton as those cases framed the test for improper appearance of bias, id. He opined that Caperton should be confined to its facts and criticized the lead opinion for "its veneration of the 'appearance of bias' standard without providing any additional guidance as to when or how to apply this imprecise standard." Id. at 41.

Justice Ziegler also agreed with the lead opinion's conclusion but wrote "to clarify the due process recusal test." Id. at 43. She stressed that "much more" than appearance of bias is required for constitutionally mandated recusal. Id. at 43-44. She advocated that Wisconsin courts should require litigants to show "extreme facts such as those in Caperton" in order to justify judicial disqualification based on the Due Process Clause. Id. at 47. She advised Wisconsin courts that

> Caperton concludes that a reasonable, well-informed person, knowledgeable about judicial ethical standards and the justice system and aware of the facts and circumstances the judge knows or reasonably should know, would reasonably question the judge's ability to be impartial because of actual bias or the probability of a serious risk of actual bias. Such circumstances are exceedingly rare.

Id. at 71-72.

10

C.    Federal *Habeas* Petition (Dkt. No. 1)

The *habeas* petition raised one ground for relief: that the state violated the petitioner's right to due process by allowing an objectively biased judge to preside over his sentencing. Dkt. No. 1 at 6. In his accompanying brief, the petitioner asserted that the Wisconsin Supreme Court's decision "resulted from an unreasonable application of the line of United States Supreme Court cases culminating in" Caperton. Dkt. No. 11 at 22. He asked the court to grant his petition and order re-sentencing by a different judge. Id. at 29.

## II.    Judge Duffin's Report and Recommendation (Dkt. No. 15)

At this court's request, on August 9, 2019 Judge Duffin wrote a report and recommendation. Dkt. No. 15. The report recounted the relevant factual and procedural details before reciting the applicable standard under Anti-Effective Death Penalty Act (AEDPA), 28 U.S.C. §2254. Id. at 1-5. Judge Duffin then reviewed the Supreme Court's jurisprudence on judicial recusal under the due process clause. Id. at 5-6. He observed that

> . . . the [Supreme] Court has never held that a judge must recuse herself because a family member was a victim of a similar crime. Thus, [the petitioner] cannot show that the Wisconsin Supreme Court's decision was 'contrary to' clearly established federal law. He implicitly concedes as much. (*See* ECF No. 13 at 3 ("*Caperton* is factually different from this case.").) Rather, he may prevail, if at all, only if he can show that the Wisconsin Supreme Court's decision 'involved an unreasonable application of' clearly established federal law.

Id. at 8.

11

Judge Duffin remarked that the petitioner faced a "doubly high" obstacle; not only is recusal required in only the most extreme instances, but also a federal *habeas* court applies a deferential standard of review to state court decisions. Id. at 8. Judge Duffin concluded that the petitioner could not meet his burden because "[t]his was not an extreme case of alleged bias." Id. He reasoned that the sentencing judge's statements about her sister "may have been poignant and personal," but "were not unlike the sorts of statements judges routinely make at sentencings." Id. at 9. He referenced the Supreme Court's view that "[i]t is neither possible nor desirable for a person to whom the State entrusts an important judgment to decide in a vacuum, as if he had no experiences[,]" id. (citing Barclay v. Florida, 463 U.S. 939, 950 (1983)), and remarked that "[e]xpecting a judge to shut out her personal experiences is inconsistent with human nature." Id.

Judge Duffin viewed the statements in context, finding that "speaking out on behalf of the community she was elected to serve" was "wholly consistent with the judge's role, justice, and due process." Id. at 10. Judge Duffin deemed the judge's comments about her past experience "[f]ar from inappropriate" and, in fact, to be in compliance with Chapter 950 of the Wisconsin Statutes (which codifies the policy that crime victims are to be considered at all stages of the criminal process). Id. He construed the petitioner's argument as implying that the sentencing judge "would have been better off saying nothing and not expressing her personal experience." Id. at 11. Judge Duffin reasoned that "[t]his would be an unfortunate lesson" because

12

the sentencing judge "surely would have been no less affected by her personal experiences had they gone unexpressed." Id.

Judge Duffin did not rule out the possibility that a judge's extreme personal circumstances could constitutionally require recusal but commented that the Supreme Court had not yet recognized any such situations. Id. at 12. He then identified cases from around the country in which courts rejected claims similar to the petitioner's:

> *Mann v. Thalacker*, 246 F.3d 1092, 1097 (8th Cir. 2001) (reversing district court's grant of habeas relief and holding that judge's sexual assault as a child did not make her unconstitutionally biased against defendant convicted of sexual assault); *Barber v. Gladden*, 327 F.2d 101, 104 (9th Cir. 1964) (rejecting claim of bias where sentencing judge discussed "a boyhood experience wherein safecrackers had robbed and shot at the judge's father" and petitioner was convicted of a similar crime); *Gray v. Beard*, No. 2:11-cv-2974-JKS, 2013 U.S. Dist. LEXIS 157132, at \*30-31 (E.D. Cal. Oct. 31, 2013) (rejecting claim that judge was required to recuse herself in petitioner's domestic violence case because judge had previously sought a protective order against her son); *Searle v. Rapelje,* No. 2:09-CV-13369, 2011 U.S. Dist. LEXIS 100298, at \*14-18 (E.D. Mich. Sep. 7, 2011) (rejecting habeas claim that petitioner's due process rights were violated when petitioner was convicted of arson resulting in the deaths of 18 horses and judge at sentencing referred to his experience growing up on a farm with horses); *Andrews v. Davis*, No. 07-14917, 2010 U.S. Dist. LEXIS 112174, at \*38 (E.D. Mich. Oct. 20, 2010) (rejecting claim of biases founded on the fact that "[t]he trial court commented on his personal experience with bipolar disorder, based on his own son having suffered from the same disorder, before declining to take petitioner's bipolar condition into account at sentencing"); *Welch v. Burke*, 49 F. Supp. 2d 992, 1008-09 (E.D. Mich. 1999) (rejecting claim that judge was biased in sentencing him for murder because he "considered the death of his own child and sympathized with the victim's family when imposing the sentence"); *cf. Martinez v. Stridiron*, 538 F. App'x 184, 188-89 (3d Cir. 2013) (rejecting habeas claim that petitioner's due process rights were violated when defendant killed the niece of the sentencing judge's bailiff); *Greenway v. Schriro*, 653 F.3d 790, 807 (9th Cir. 2011) (rejecting habeas claim based on the fact that

13

> the judge who sentenced petitioner to death had been a police officer 18 years before trial and worked briefly with the ex-husband/father of the two murder victims.).

Id. at 12-13. Judge Duffin recommended that this court deny the petitioner's *habeas* petition. Id. at 13.

### III. Petitioner's Objections (Dkt. No. 17)

#### A. Petitioner's Motion for Extension of Time to File Objections (Dkt. No. 16)

At the end of Judge Duffin's August 9, 2019 report and recommendation, he advised the petitioner that objections were due within fourteen days of the date of his order (which, in this case, would have been by August 23, 2019). Dkt. No. 15 at 14. The court did not receive any objections within the fourteen-day period. On September 5, 2019—twelve days *after* the deadline passed—the court received a motion for extension of time to file objections. Dkt. No. 16. Counsel for the petitioner stated in that motion that she never had filed objections to a magistrate judge's report and recommendation and had failed to properly calendar her deadline for objections under Federal Rule of Civil Procedure 72. Id. at 1-2. Counsel filed the objections the next day—September 6, 2019. Dkt. No. 17.

"By not filing timely objections, litigants typically waive their right to challenge on appeal the issues decided in a magistrate judge's recommendation." Ammons-Lewis v. Metro. Water Reclamation Dist. of Greater Chi., 543 F. App'x 591, 594-95 (7th Cir. 2013) (citations omitted). Under Fed. R. Civ. P. 6(b)(1)(B), a court may, "for good cause," extend the deadline for filing objection after the deadline for doing so has expired "if the party failed to act

14

because of excusable neglect." For the court to grant the motion to extend time, the petitioner must show both good cause and excusable neglect. The Seventh Circuit has instructed that "a judge asked to waive or extend a deadline must evaluate the excuse offered by the party seeking the waive or extension and the consequences to all persons affected by the granting or denying of it." Commodity Futures Trading Com'n v. Lake Shore Asset Mgmt. Ltd., 646 F.3d 401, 405 (7th Cir. 2011). "The stronger the excuse and the graver the adverse consequences of rejecting it relative to the adverse consequences to the opposing party if the excuse is allowed, the more the balance leans toward granting." Id. (citations omitted).

The court realizes that mistakes can happen when a lawyer never has had occasion to perform a particular task, and it knows that procedures in state court are different than procedures in federal court. Counsel's excuse, however, is not a particularly strong one, given the advisement Judge Duffin placed right in his report and recommendation. Counsel did not need to be familiar with the procedure under this court's local rules or the federal rules; she needed only read Judge Duffin's order. That said, while the excuse for failing to timely file objections is not strong, the court sees little adverse consequence to the respondent. The missed deadline caused a delay of only twelve days or so in a case that had been pending almost three years. This court has delayed in ruling on the objections. And adverse consequences could accrue to the petitioner on appeal if this court does not consider the merits of

his objections. The court will grant the motion for an extension of time and will consider the late-filed objections.

B.    Petitioner's Objections (Dkt. No. 17)

The petitioner objected to two of Judge Duffin's conclusions, arguing that (1) Judge Duffin incorrectly concluded that the sentencing judge's appearance of bias did not demonstrate objective bias in violation of due process, id. at 3, and that (2) Judge Duffin incorrectly concluded that the Wisconsin Supreme Court did not unreasonably apply the line of United States Supreme Court cases culminating in Caperton, id. at 18.

1.    *Objective Bias*

The petitioner reviews Supreme Court precedent regarding circumstances in which due process requires judicial recusal. Id. at 3-5 (citing Tumey v. Ohio, 273 U.S. 510, 532 (1927); In re Murchison, 349 U.S. 133, 136 (1955); Withrow v. Larkin, 421 U.S. 35 (1975); and Caperton v. A.T. Massey Co., 556 U.S. 868 (2009)). After surveying the various ways that the Caperton case formulated the test for objective bias, id. at 7-8, the petitioner admits that the "magistrate judge correctly describes the United States Supreme Court precedent regarding objective judicial bias." Id. at 8. So the petitioner has not argued that Judge Duffin *mis-stated* the law; rather, he argues that Judge Duffin (and the Wisconsin Supreme Court) failed to recognize that these facts required recusal under the law.

The petitioner stresses the importance of the sentencing hearing by arguing that a sentencing judge exercises a unique discretion; "[u]nlike

16

evidentiary rulings on pretrial motions or rulings during the course of a trial, the sentencing decision is not readily subject to review for fairness based on objective standards. Whether the sentence was right or wrong, fair or unfair often depends on who is asked." Id. at 8-9. The petitioner argues that the sentencing judge demonstrated objective bias because "there is a vast difference between feeling sympathy for the victims and wholly identifying with them." Id. at 8.

The petitioner contends that the prominence of the sentencing judge's comments about her personal tragedy belied her statement that she would zealously try to set it aside. Id. at 10-11. He contends that a reasonable observer "would have been struck by the uncanny similarity between the accident that took the life of the judge's sister and the one in this case[.]" Id. at 11. He asserts that the similarity between the two accidents turned the "terribly sad" sentencing testimony into "excruciating" testimony that "would have taken super-human emotional control for a judge who proclaimed that she still felt the pain of her sister's death every day to remain impartial as she listened to all of this." Id. at 12. The thrust of the petitioner's claim is that "when a case so intimately touches on a judge's deepest personal pain, there must be a point at which we acknowledge that impartiality is simply too much to expect." Id. at 12-13.

The petitioner alleges that Judge Duffin's report failed to mention "the uncanny similarity between the accident that took the life of the judge's sister and the one in this case—each of them a summertime accident in which five

17

young women were traveling in a car that was struck by a drunk driver with horrific results." Id. at 11. He disputes Judge Duffin's conclusion that when the sentencing judge commented about her personal experience, she simply was "expressing her empathy for the victims of [the petitioner's] crimes in the most sincere and credible way" and was exercising her role with a "level of compassion for the victims." Id. at 13 (citing dkt. no. 15 at 10, 11). The petitioner points to the sentencing judge's comments after pronouncing her sentence as supporting his objective bias claim. Id. at 16. He argues that by prohibiting the petitioner from sending letters to the victims, "[t]he judge was so personally invested in protecting these victims from even incidental unpleasantness that she committed an obvious First Amendment violation." Id. He says this shows a lack of the "'calm detachment necessary for fair adjudication.'" Id. at 17 (quoting Mayberry v. Pennsylvania, 400 U.S. 455, 465 (1971)).

### 2. *Unreasonable Application of Supreme Court Precedent*

The petitioner also objects to Judge Duffin's application of AEDPA. Id. at 18. He argues that Judge Duffin's recommendation focused on his agreement with the Wisconsin Supreme Court's determination that no due process violation occurred. Id. He says that Judge Duffin should have found that there *was* a due process violation; that finding would have led to the conclusion that the Wisconsin Supreme Court's decision was contrary to and an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. Id.

18

The petitioner concedes that all seven Wisconsin Supreme Court justices concluded that there was no due process violation but argues that the multiple concurring opinions left the court "fractured." Id. at 19. The petitioner says that Justice Ziegler's and Justice Prosser's concurring opinions improperly narrowed Caperton. Id. (citing Rippo v. Baker, 2017 WL 855913 (U.S. Mar. 6, 2017) (holding "the Due Process Clause may sometimes demand recusal even when a judge 'ha[s] no actual bias.'")). Nonetheless, he admits that "the lead opinion identified the correct standard[.]" Id. at 21.

The petitioner argues that, like Judge Duffin, the Wisconsin Supreme Court unreasonably applied the standard to the facts of his case. Id. at 22. He says that the court understated the personal nature of the sentencing judge's statements. Id. He contends that the court did not explain how placing the judge's remarks into context rendered the troubling remarks free from the appearance of bias. Id. at 23. He criticized the court's decision to ignore the sentencing judge's comments about her "destiny" or the "higher power" that placed her as the decider in the case. Id. at 23-24.

Finally, the petitioner argued that the lack of case law dictating recusal does not doom his claim because

> AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . Nor does AEPDA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced.

Id. at 25 (quoting Panetti v. Quarterman, 551 U.S. 930, 953 (2007)). As for the out-of-circuit authority cited by Judge Duffin, the petitioner argues that none

19

of the cases involved judicial statements akin to the statements the judge made

in his case. Id. at 25-26. He concludes by reiterating that this case presents

extreme facts: a judge who lived through the loss of a close family member in a

nearly identical accident, who talked at length about her personal tragedy and

who identified so closely with the victims that she used the pronoun, "we." Id.

at 26.

## IV. **Analysis**

### A. Standard of Review

Under Rule 12 of the Rules Governing Section 2254 Cases, the Federal

Rules of Civil Procedure apply to *habeas* cases filed under 28 U.S.C. §2254.

Under 28 U.S.C. §636(b)(1) and Federal Rule of Civil Procedure 72(b)(3), if a

party objects to a magistrate judge's report and recommendation, the district

court must conduct a *de novo* review of any portion of the recommendation to

which the party properly objected. Id. The district court may "accept, reject, or

modify the recommended disposition; receive further evidence; or return the

matter to the magistrate judge with instructions." Id.

Under the AEDPA, a court may grant federal *habeas* relief only where the

state court proceedings "(1) resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States;" or "(2) resulted in a

decision that was based on an unreasonable determination of the facts in light

of the evidence presented in the state court proceeding." 28 U.S.C. §2254(d).

The petitioner argues under subsection (d)(1) that the Wisconsin Supreme Court unreasonably applied clearly established Supreme Court precedent. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (internal citations omitted). "A state court's determination that a claim lacks merit precludes federal *habeas* relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 102 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "If this standard is difficult to meet, that is because it was meant to be." Id. "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. at 102-03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 (1979)).

"AEDPA requires that [the state court decision] be 'unreasonable,' which means something like lying well outside the boundaries of permissible differences of opinion." Hardaway v. Young, 302 F.3d 757, 762 (7th Cir. 2002). "Where Supreme Court cases 'give no clear answer to the question presented, let alone one in [the petitioner's] favor,' it cannot be said that the state court unreasonably applied Supreme Court precedent and thus 'relief is unauthorized.'" Clark v. Lashbrook, 906 F.3d 660, 664 (7th Cir. 2018) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)).

The reasonableness of a court's decision may turn on the underlying rule; the Supreme Court has said that

> [i]f a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough, 541 U.S. at 663-64. The Supreme Court also has made clear, however, that the fact

> [t]hat the standard is stated in general terms does not mean the application was reasonable. AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner.

Panetti, 551 U.S. at 953 (citation and internal quotation marks omitted).

B.    Discussion

"It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" Caperton, 556 U.S. at 876 (quoting In re Murchison, 349 U.S. at 136). However, "'most matters relating to judicial disqualification [do] not rise to a constitutional level.'" Id. (quoting FTC v. Cement Institute, 333 U.S. 683, 702 (1948)).

"Due process guarantees 'an absence of actual bias' on the part of a judge." Williams v. Pennsylvania, —U.S.—, 136 S.Ct. 1899, 1905 (2016). Because "bias is easy to attribute to others and difficult to discern in oneself," a

22

reviewing court must "ask[] not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in [her] position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" Id. (quoting Caperton, 556 U.S. at 881)).

As Judge Duffin noted, the Supreme Court has characterized the test in "subtly different ways." Dkt. No. 15 at 7. He recounted that

> (1) [the Supreme Court] characterized the relevant inquiry as "whether, 'under a realistic appraisal of psychological tendencies and human weakness,' the [judge's] interest 'poses such a great risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." Caperton, 556 U.S. at 883-84 (quoting Withrow, 421 U.S. at 47).
>
> (2) [The Supreme Court] offered the more general view that recusal is required when, objectively, 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.' [Caperton, 556 U.S.] at 872 (quoting Withrow, 421 U.S. at 47).
>
> (3) [The Supreme Court] also stated the relevant question is whether "the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" Williams, 136 S.Ct. at 1905.

Dkt. No. 15 at 7-8.

The differences between these standards are not particularly relevant given the nature of the petitioner's objection. The petitioner concedes that Judge Duffin correctly distilled the Supreme Court precedent. His objection is to Judge Duffin's application of the law to the facts of his case, urging that "these facts are extreme" and that a reasonable observer would have perceived an impermissible level of bias.

23

This court agrees with Judge Duffin, all seven justices of the Wisconsin Supreme Court, the panel of the Wisconsin Court of Appeals and the trial judge herself. The sentencing judge's personal circumstances and remarks did not require her to recuse under the due process clause.

The court starts with the context of the remarks. The sentencing judge referenced her personal circumstances at the outset. The petitioner argues that by acknowledging her personal experience at the outset, the sentencing judge was signaling a bias that she would not be able to set aside. The court agrees with Judge Duffin that it was, instead, an acknowledgment of her awareness that the potential for bias existed, and her public statement that she knew her obligation was to set that bias aside. This court instructs jurors in its standard opening trial instructions that

> many, if not all of us, have biases that we do not even recognize—"implicit biases." We are influenced by information without even realizing it. It is hard to recognize these biases, and to set them aside. But it helps to be aware that, while I do not believe that I am biased against a person of a particular gender or race or background, I may unknowingly be influenced by those factors. *Being aware helps us guard against making decisions based on implicit bias.*

(emphasis added). The sentencing judge had a personal experience that aligned with that of the victims, and she knew it. Her awareness of it was critical to her ability to try to set it aside. As Judge Duffin noted in quoting the Supreme Court's decision in Barclay, "It is neither possible nor desirable for a person to whom the State entrusts an important judgment to decide in a vacuum, as if he had no experiences.'" Dkt. No. 15 at 9 (quoting Barclay v. Florida, 463 U.S. 939, 950 (1983)). The sentencing judge's awareness and recognition of the

24

possibility that she had a personal experience that might align her views more with one party than the other was a necessary first step in trying to avoid allowing that experience to exert an impermissible influence on her sentencing decision.

The petitioner next expresses concern about the judge's comments that perhaps "destiny" or a "higher power" or the "prayers of many others" caused her to be the judge in the petitioner's case. The sentencing judge *did* opine that her personal experience made her more likely "than anyone else who would be able to sit on this bench in this county" to "understand the pain that these victims are feeling." Dkt. No. 17 at 13. But the petitioner ignores what the judge said next. She next acknowledged that she had the benefit of "all those years since 1976" to understand that while she had to "make [the petitioner] pay," no sentence she could impose would lessen the pain to the victims. Id. While the petitioner sees the judge's view that her personal experience made her uniquely suited as evidence that she had suffered "a complete loss of judicial perspective," he ignores the perspective the judge explained that she had gained with the passage of time.

The petitioner views the judge's use of the words "make [the petitioner] pay" as an expression of personal retribution. But one of the objectives of sentencing is punishment. State v. Gallion, 270 Wis. 2d 535, 556-57 (2004). Punishment is the infliction of a penalty as retribution for an offense. Part of a sentencing judge's job is to require a defendant to "pay" for what the defendant

has done, and to determine what "payment" is appropriate given the offense and the defendant's personal circumstances.

The petitioner also criticizes the judges "sense of mission" to speak out on behalf of the community. Another objective of sentencing is deterrence of others—preventing others from committing the types of offenses the defendant committed. Id. The sentencing judge spoke of the need to communicate to others that drinking and driving was a serious offense. It is any sentencing judge's mission to consider how the sentences she imposes might deter others; the fact that the judge may have felt that mission more strongly than some other judges might does not demonstrate impermissible bias.

The petitioner asserts that even after the judge sentenced him, her "personal investment" in protecting the victims from "incidental unpleasantness" caused her to violate the petitioner's First Amendment rights by prohibiting him from sending any letters to the victims or the community without first running it by the district attorney's office. Dkt. No. 17 at 16-17. The petitioner argues that this prohibition was extreme and overbroad and asserts that this shows that the judge was not acting with the "calm detachment necessary for fair adjudication." Id. at 17 (quoting Mayberry, 400 U.S. at 465). The judge imposed this requirement as a condition of supervision—one the petitioner could have challenged. And, as he concedes, he has not raised a First Amendment argument. He simply views this supervision condition as more evidence that the judge was motivated by a bias in favor of the victims and against him. This court suspects that many judges—even those

26

who had not lost a sister to an accident caused by a drunk driver—would have felt the need to protect victims from unwanted contact with the petitioner.

Likely many judges have been victims of crime, have loved ones who were crime victims or have lost family members to crime. But the Due Process Clause doesn't require a judge to recuse herself in every case that reminds her of her own life. While, as Judge Duffin recounted, the sentencing judge was "undisputedly able to consider how these victims were impacted by the crime" and "exercised [her role] with a level of compassion for the victims and an awareness of the collateral consequences of drunk driving not often expressed in the sentencing proceedings that too many judges reduce to rote," dkt. no. 15 at 11, that compassion and awareness did not rise to the level of unconstitutional impartiality.

Stepping outside of the context of the sentencing judge's statements, however, the issue for *this* court is not whether the sentencing judge was impermissibly biased, or whether her remarks gave the impression of bias. Under AEDPA and the deferential standard this court must employ when considering the decision of the Wisconsin Supreme Court, the only issue for this court to decide is whether the Wisconsin Supreme Court's decision constituted an unreasonable application of the rule to the facts. The "rule" here is that judges must recuse themselves where the appearance of bias presents a serious risk of actual bias. See Caperton, 556 U.S. at 881. The Supreme Court has said that applying general rules to specific cases requires a "substantial element of judgment." Yarborough, 541 U.S. at 663-64. It is difficult to hold

27

that a state court's application of a general rule is "unreasonable" until precedent more precisely identifies the contours of the rule such that a court can deem an application of it "unreasonable." <u>Id.</u> ("Other rules are more general, and their meaning must emerge in application over the course of time.") The contours of where the Due Process Clause requires judicial recusal on the basis of appearance of bias are fact-specific and will vary depending on the circumstances of the case. <u>See</u> <u>Caperton</u>, 556 U.S. at 890-91 ("a 'probability of bias' cannot be defined in any limited way. The Court's new 'rule' provides no guidance to judges and litigants about when recusal will be constitutionally required.") (Robert, C.J. dissenting). On the facts of this case, and the law correctly cited by the Supreme Court, this court has no basis for concluding that the Wisconsin Supreme Court unreasonably applied that law to the facts of the petitioner's case.

The petitioner has not cited any cases showing that the U.S. Supreme Court (or any other federal court) has held that the Due Process Clause requires recusal where a judge has personally suffered a loss from a crime similar to the one committed by the defendant she is sentencing. Judge Duffin provided a variety of examples where courts had found *no* due process violation even though the judges had personal relationships with either the victims or with the crime. The generality of the rule combined with the weight of this persuasive authority convinces the court that the petitioner could not meet the AEDPA standard for federal *habeas* relief even if this court agreed that the sentencing judge's remarks constituted a due process violation.

28

The court agrees with Judge Duffin's recommendation that the petitioner is not entitled to federal *habeas* relief on the ground that the sentencing judge violated his due process rights. He has not presented any other grounds for federal *habeas* relief. The court will dismiss the petition.

## V. Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. §2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Peterson v. Douma, 751 F.3d 524, 528 (7th Cir. 2014) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). The court declines to issue a certificate of appealability, because no reasonable jurist could debate that the sentencing judge exhibited impermissible bias constituting a violation of due process.

## VI. Conclusion

The court **ADOPTS** Judge Duffin's report and recommendation. Dkt. No. 15.

The court **GRANTS** the petitioner's motion for an extension of time to file objections. Dkt. No. 16.

The court **OVERRULES** the petitioner's objections. Dkt. No. 17.

Case 2:16-cv-01353-PP   Filed 09/25/20   Page 29 of 30   Document 19

The court **DENIES** the petition for writ of *habeas corpus* under 28 U.S.C. §2254.

The court **DECLINES** to issue a certificate of appealability.

The court **ORDERS** that this case is **DISMISSED** and will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 25th day of September, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

30